# COURT OF APPEALS OF TEXAS.

## GALVESTON TERM, 1881.

### JUAN REYES *v.* THE STATE.

1. MURDER.— Evidence tending to show that the killing was done in the perpetration, or in the attempt at the perpetration of either arson, rape, robbery, or burglary, is admissible as part of the *res gestæ*, upon trial of an indictment charging murder by violence and upon express malice aforethought.
2. SAME — CONFESSIONS.— The rule which requires the exclusion of confessions made in arrest refers to confessions of the defendant, and not to statements made by a witness, unless it is made to appear that the witness was under arrest and charged with the offense on trial.
3. PRACTICE.— The proper way to supply written testimony of a witness before a coroner's inquest, but since lost, is to introduce witnesses who were present when the witness' testimony was taken before the inquest, and have them testify as to what was deposed. See the opinion for circumstances under which the court properly excluded a copy of written testimony.
4. EVIDENCE.— See evidence held sufficient to sustain a conviction for murder in the second degree.

APPEAL from the District Court of Bexar. Tried below before the Hon. G. H. NOONAN.

The appellant was convicted of murder in the second degree upon an indictment charging him with the murder of Bruno Hidalgo, on January 1, 1881.

Clothilda Cadena y Hidalgo, wife of the deceased, was the first witness for the State. She testified, in substance, that about ten o'clock on the night of the killing, January 1, 1881, the deceased and the defendant returned from San Antonio to Charles Dignowitty's wood camp,

on the Salado. Her husband and herself occupied a tent at that camp.. Upon their arrival at the camp on the night in question, the deceased unhitched his horses from his wagon and left them standing near the camp, and he and defendant approached the fire. The deceased handed the witness some money, telling her to put it away, which she did by locking it in a trunk in the tent. After finishing supper at the fire, deceased told witness to bring him the hobbles; that he would hobble his horses on the grass. Witness started for the hobbles, when defendant told her to stop; that he was going to Fort Clark and intended to take the horses with him. The deceased then said to defendant, "The horses are mine; what are you going to take them to Fort Clark for?" Defendant replied, "Because I want to; I am a man and can do it." Thereupon the defendant got up from his seat near the fire, and, going to a tree near by, took from it a butcher knife that had been stuck in it. He placed the knife under his arm, and covered it with a blanket he had thrown around him. Defendant then told his son Gregorio, who was standing near, to get his gun and ammunition and saddle the horses, which Gregorio proceeded to do. The deceased then told defendant that he should not take his (the deceased's) horses, and defendant drew his knife and struck deceased across the mouth with the handle. Witness took her little girl in her arms and begged deceased to leave the camp with her, as she feared defendant would kill him. Witness and deceased started to run, but defendant caught deceased by the arm, and said, "Men don't run; stop and fight me. I am a man, and am going to kill you." Defendant then seized an axe lying near, and with it struck deceased in the forehead, knocking him down. He then called to his son Gregorio for his gun; and, on its being handed him, he shot the deceased. Witness ran on into the woods and heard deceased calling out, "Clothilda! Clothilda! Don't leave me! I am dying!"

The defendant said, "She can do you no good," and, turning the deceased over, again struck him on the head with the axe. After killing the deceased, the defendant broke open the trunk in the tent and took from it the money witness had received from the deceased and put in the trunk. He took also some bed clothing, a bed-tick, and the horses, and left. Witness was on the scene of the murder next day, when an inquest was held on the body of deceased. The body was then lying just as left after the killing.

The cross-examination made no change in the substance of this evidence. She stated that the amount of money handed her by her husband, and placed by her in the trunk, was five dollars. She ran off into the woods while her husband was being killed, and did not see the defendant break open the trunk and take the money and other things. She went back to camp next morning, and found the trunk broken open, and the articles described gone, and that is why she testified that defendant did the breaking and taking. The knife described was a very large, new butcher-knife, with a blade about the length of the witness' arm from her elbow down. It was not a home-made knife. There were two knives in camp, and both were found next morning in camp. The witness denied having testified before the coroner that the deceased was shot before being struck with the axe. With regard to the violence used, she testified before the coroner as she testified on the trial. It was too dark for the witness to see the parties when the defendant struck the deceased the last time, but she knew of the striking by hearing the licks and from what the defendant said at the time. If the deceased owed the defendant any money, the witness did not know it. Witness did testify before the coroner that defendant was drunk on the night of the killing. The parties told her they had been drinking in town. They brought no whiskey to camp, and deceased

was not drinking when killed. The defendant was not so drunk that he did not know what he was doing. The witness wandered through the woods all night after the killing, and she denied that she testified before the coroner that she passed the night in the thicket near the camp.

Joe Sheeley, a deputy sheriff of Bexar county, testified for the State that on the morning following the killing, the last witness told him of the killing, and gave him a description of the defendant, and of the horses he had taken. In company with Mr. Nat Lewis, he started in pursuit, having heard of a traveler on·what was known as the North Castroville road. About sixteen miles from San Antonio he overtook the defendant and his son, having the horses described in their possession. When arrested, the defendant gave his name as "Pedro Alcorte," and denied knowledge of the murder, ·and further said that he had never been on the Salado. The witness asked him if his name was not Juan Reyes, and he said that it was not. Besides the horses, the defendant had with him a bed-tick which belonged to deceased.

Peter Shields, the justice of the peace who held the inquest upon the deceased, testified to the appearance of the body when found next morning. There was a gunshot wound in the back, and the skull was crushed in over the eye from the front, and behind. The gun-shot wound was badly powder burned, and appeared to have been inflicted from short range.

Nat Lewis, for the State, corroborated the evidence·of Joe Sheeley.

For the defense, Gregorio Reyes, eleven years old, testified that he was the son of the defendant, and that he was in bed when defendant and deceased returned to the camp. He overheard them quarreling outside, and got up and went out. The defendant said that deceased owed him twenty dollars, and demanded its payment. The deceased thereupon attacked defendant with a large home-

made butcher-knife, and then the defendant shot him. Defendant then ordered witness to saddle up the horses, which he did. Stripped of detail, this is the substance of the evidence of this witness on his examination in chief.

Cross-examined, the witness averred positively that he did not give the gun to the defendant, but that the latter got it himself from the tent. Witness had not been asleep. He saw the difficulty from the beginning to the end. He saw no axe used at all. From the scene of the killing, he and defendant started to Fort Clark. The witness admitted that he had conversed with Joe Sheeley about this case, but denied that he told Sheeley and Lewis, when his father was arrested, on the Castroville road, that he was asleep at the time of the difficulty, and knew nothing of it, and that he did not hear the report of the gun. He did not tell either Sheeley or Lewis, at any time or place, that he was asleep on the occasion referred to, and that defendant woke him up, telling him that they must go to Las Moras, and that then for the first time he saw the dead body of the deceased. He did not, on an occasion indicated, tell Mr. Lewis that he was asleep at the time and knew nothing of the killing, and that he did not know why he and his father left camp at night. He did not tell Mr. Lewis on that occasion that when he asked his father, the defendant, why they were leaving camp at night, the latter told him that he had had a difficulty with the deceased and was afraid of the sheriffs, nor did he tell Adolph Vidal at any time that he was asleep when the killing occurred. These several parties, on the part of the State, testified that the witness did make the statements he denied.

In answer to a direct question, he affirmed positively that, in a second conversation with Vidal, he did not say that defendant first crushed deceased's skull with an axe, and then burned his mouth with a fagot. Witness heard

the deceased call to his wife, "Clothilda! Clothilda! Don't leave me! I am dying!"

The remainder of the evidence is unimportant.

No brief for the appellant.

*Horace Chilton*, Assistant Attorney General, for the State.

WHITE, P. J.    Appellant was tried for the murder of Bruno Hidalgo, charged to have been committed on the 1st day of January, A. D. 1881, in Bexar county. He was convicted on the 27th day of January, 1881, of murder in the second degree, and his punishment was fixed by the verdict and judgment at twenty years' confinement in the penitentiary.

As shown by the first bill of exceptions, the State's counsel "asked the witness Clothilda Cadenas if she was robbed of any money on the night of the killing? and if the defendant had any knowledge of her having any money?" Defendant's counsel objected to the questions on the following ground: "Because the defendant was not charged with robbery in the indictment." As this is the only objection urged to the questions stated in the bill of exceptions, we presume that it was the only ground upon which the evidence was sought to be excluded. This objection was not well taken. The rule is that "when a murder by violence and upon express malice aforethought is charged, then the prosecution may show, as part of the *res gestæ*, that it was also done (if such were the fact) in the perpetration or in the attempt at the perpetration of either arson, rape, robbery, or burglary." *Roach* v. *The State*, 8 Texas Ct. App. 478. This being the only objection to the testimony, the court did not err in overruling it.

The second, third, fourth and fifth bills of exceptions

relate to the same subject matter, and may be treated as one.    For the purpose of impeaching the defendant's witness, Gregorio Reyes, the county attorney, after laying the proper predicate by stating time, place and circumstances, asked said witness if he had not made such and such statements, to parties who were named, about the murder and matters transpiring at the time of the killing.    This testimony was objected to by defendant's counsel upon the ground that at the time said proposed statements were made by the witness, he, the witness, was under arrest.    In certifying each of these bills, the judge explains that the evidence showed that the witness was not, at the time the statements were made, under arrest or in duress.

Supposing the witness had been under arrest, this fact would not have rendered the statements inadmissible, unless it were shown that he was under arrest charged with the murder for which he was on trial.    Confessions which are excluded as evidence because made whilst under arrest are those which are made *by the defendant.*    Code Crim. Proc. arts. 749, 750.    Here the statute is sought to be made applicable, not to the confessions of a defendant who is under arrest, but to the statements of a witness who, if at the time under arrest, for aught that the record shows was under arrest for some other offense. The provisions of the statute cannot be strained to such an extent, and were not intended to embrace such statements.

The remaining bill of exceptions is to the refusal of the court to permit defendant's counsel to prove up and read to the jury a copy of the testimony taken upon the coroner's inquest,— the testimony as taken down in writing and certified by the coroner having been lost.    The bill of exceptions is too meager to show what the object and purpose of the defendant really was in desiring to read the evidence taken before the coroner; it does not show what

testimony was taken before the coroner which it was the desire of the defendant to use. If the testimony of some absent witness was desired, it is not shown who the witness was nor the diligence used. If the object was to supply a lost writing, then the proper steps to admit secondary evidence of its contents are not shown to have been taken. If the object was to furnish testimony either in support of an impeached witness or for the purpose of impeaching a witness, then the proper mode of accomplishing either object, when it was ascertained and shown that the written testimony taken before the coroner was lost, would have been to introduce witnesses who were present at the coroner's inquest, and have had them to testify as to what was at the time deposed by the witness whose testimony was called in question.

It only remains for us to say that we have considered this record carefully in the light of the evidence adduced on the trial, and we are constrained to say that in our opinion the defendant has every reason to congratulate himself upon the mildness of the punishment imposed by a merciful jury. The heartless atrocity of his crime as disclosed in the record finds but few parallels in cases of murder in the second degree. So far as we have been able to ascertain, he has had a most fair and impartial trial, and his punishment is legally and justly awarded him. The judgment of the lower court is therefore in all things affirmed.

*Affirmed.*